AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Jonathan Kim (815) 987-4451

**FILED**
12/19/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION

In the Matter of the Search of:

The cellular telephone, further described in Attachment A

Case No.

Ref No. 2024R01131

**24MC00034**

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, M. Sean McQuiston, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, fruits, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1361 | injuring or depredating property of the United States |
| 18 U.S.C. § 1752(a)(1) | entering or remaining in restricted buildings or grounds |
| 18 U.S.C. § 1752(a)(2) | disorderly and disruptive conduct in a restricted building or grounds |
| 18 U.S.C. § 1752(a)(4) | engaging in physical violence in a restricted building or grounds |
| 40 U.S.C. § 5104(e)(2)(A) | entering or remaining on the floor of either House of Congress |
| 40 U.S.C. § 5104(e)(2)(C)(i) | entering or remaining in a room in any of the Capitol Buildings set aside or designated for the use of either House of Congress, with intent to disrupt the orderly conduct of official business |
| 40 U.S.C. § 5104(e)(2)(D) | disorderly or disruptive conduct in the Capitol Buildings |
| 40 U.S.C. § 5104(e)(2)(F) | engaging in physical violence in the Grounds or any of the Capitol Buildings |
| 40 U.S.C. § 5104(e)(2)(G) | parading, demonstrating, or picketing in a Capitol Building |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_____
*Applicant's Signature*

M. SEAN MCQUISTON, Special Agent
Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: December 20 2024

_____
*Judge's signature*

City and State: Chicago, Illinois

BETH W. JANTZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                   )
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, M. Sean McQuiston, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately November 2014.

2.      I am currently assigned to the Chicago Field Office, West Resident Agency, Squad CT-2. As part of my duties as a FBI Special Agent, I investigate criminal violations relating to domestic terrorism, including criminal violations including, but not limited to Title 18, United States Code, Sections 111, 231, 249, 922, 1505, 1752, 2102 and Title 26 United States Code, Section 5861. I have been trained in, and involved with, various electronic surveillance methods, the debriefing of subjects, informants, and witnesses, as well as others who have knowledge of civil disorders and unlawful entry into restricted grounds. I have participated in multiple federal search and arrest warrants.

3.      This affidavit is made in support of an application for a warrant to search a Samsung Model #SM-S367VL (Galaxy J3 Orbit) cellular telephone with IMEI number 352069102681748 (the "**Subject Phone**") for evidence, instrumentalities, fruits, and contraband described further in Attachment B, concerning the violations of 18 U.S.C. § 1361 (injuring or depredating property of the United States); 18 U.S.C. § 1752(a)(1) (entering or remaining in restricted buildings or grounds), (a)(2) (disorderly and disruptive conduct in a restricted building or grounds), and (a)(4) (engaging in any

act of physical violence in a restricted building or grounds); 40 U.S.C. § 5104(e)(2)(A) (entering or remaining on the floor of either House of Congress), (e)(2)(C)(i) (entering or remaining in a room in any of the Capitol Buildings set aside or designated for the use of either House of Congress, with intent to disrupt the orderly conduct of official business), (e)(2)(D) (disorderly or disruptive conduct in the Capitol Buildings), (e)(2)(F) (engaging in an act of physical violence in the Grounds or any of the Capitol Buildings), and (e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) (the "**Subject Offenses**").

4.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of violations of the **Subject Offenses** are located within the **Subject Phone**.

5.     On December 18, 2024, during the arrest of the subject in this investigation, JOSHUA RAYMOND WINTON, law enforcement recovered the **Subject Phone**. I dialed 331-216-8357 (the phone number associated with the **Subject Phone**), and the **Subject Phone** rang, displaying my incoming phone number. Since December 18, 2024, the **Subject Phone** has been in the government's custody.

2

## I.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONE

### BACKGROUND – THE U.S. CAPITOL ON JANUARY 6, 2021

6.      U.S. Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred on January 6, 2021, at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510.

7.      The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.      On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, two staircases, and multiple terraces. On the east side of the Capitol is the East Front, which includes three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and closed to members of the public on January 6, 2021.

9.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately

3

1:00 p.m. Eastern Standard Time[1] in the House of Representatives. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.    The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting and did visit the Capitol complex that day.

11.    At around 1:00 p.m., individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol. As a result of these and other similar actions by the crowd, the situation at the Capitol became a civil disorder as that term is used in Title 18, United States Code, Section 231. The civil disorder obstructed the ability of the U.S. Secret Service to perform the federally protected function of protecting Vice President Pence.

12.    As they advanced unlawfully onto Capitol grounds and towards the U.S. Capitol building over the next several hours, individuals in the crowd destroyed barricades and metal fencing and assaulted law enforcement officers with fists, poles, thrown objects, and chemical irritant sprays, among other things. Individuals in the

---

[1] All times stated in this affidavit are in Eastern Standard Time or Eastern Daylight Time unless otherwise noted.

crowd carried weapons including tire irons, sledgehammers, bear spray, and tasers, some of which were also used to assault members of law enforcement. A number of individuals in the crowd wore tactical vests, helmets, and respirators.

13.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.

14.     Beginning shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement.

15.     Once inside, certain of the unlawful entrants destroyed property, stole property, and assaulted federal police officers.

16.     Between approximately 2:10 p.m., and 2:30 p.m., Vice President Pence evacuated the Senate Chamber, and the Senate and House of Representatives went into recess. Unlawful entrants into the U.S. Capitol building attempted to break into the House chamber by breaking the windows on the chamber door. Law enforcement officers inside the House of Representatives drew their weapons to protect members of the House of Representatives who were stuck inside. Both the Senate and the House of Representatives Chamber were eventually evacuated.

17.     At around 2:47 p.m., subjects broke into the Senate Chamber not long after it had been evacuated.

5

18.     At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. Mayor Bowser's order imposing a curfew in the District of Columbia impacted interstate commerce. For example, grocery store Safeway closed all 12 of its stores in the District of Columbia as of 4 p.m. that day, and Safeway's stores were supposed to close at 11 p.m.

19.     At about 3:25 p.m., law enforcement officers cleared the Senate floor. Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

20.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening, the joint session could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol throughout the events, including during the time he was evacuated from the Senate Chamber until the joint session concluded at approximately 3:44 a.m. on January 7, 2021.

21.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the

scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

22.      Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

23.      Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

**IDENTIFICATION OF JOSHUA WINTON**

25.      The FBI investigated James Robert Elliott (who pleaded guilty to a violation of 18 U.S.C. § 111(a)(1) on October 29, 2022, *United States v. Elliott,* 21-cr-735 (RCL)) for participating in the riot on January 6, 2021, and assaulting a law-enforcement officer on the West Front with a flagpole. Through interviews and a search

7

of Elliott's phone, the FBI identified JOSHUA RAYMOND WINTON as an associate of Elliott, and further determined that WINTON used telephone number 331-216-8357, saved in Elliott's phone under the contact name "Josh". In text messages found on Elliott's phone between Elliott and WINTON, using 331-216-8357, Elliott and WINTON discussed traveling to the Stop the Steal rally in Washington, D.C., and staying at the Mayflower Hotel while in Washington. Records obtained from the hotel showed a reservation made by WINTON on December 27, 2020, for the night of January 5, 2021.

26. In September 2022, the FBI interviewed WINTON. Winton provided as his telephone number 331-216-8357 and confirmed that he is the person circled in yellow in Image 1 below.



*Image 1: a still photograph of WINTON (circled in yellow) attending the Stop the Steal rally, on the National Mall, on January 6, 2021.*

27.     According to records from TracFone Wireless, no name was provided for the subscription for number 331-216-8357. However, Tracfone Wireless records show that the account was paid for with a credit card belonging to WINTON, with a billing address that matched the home address associated with WINTON's Illinois driver's license record as of January 6, 2021.

28.     Text messages recovered during the search of Elliot's phone showed that on January 6, 2021, at 8:02 a.m., Elliott sent WINTON a text message reading, "Were [sic] you at?" At 1:40 p.m., WINTON responded, "We need some prybars," "Well, that was an adventure," and "Where are you?" On January 8, 2021, Elliott sent a message to WINTON that read, "Good news Josh they released the person of interest list, none of us are on it. The [sic] don't even have us on any pictures." Elliott also sent a text message to another individual stating, "No I stopped outside. I was there for the people not the building. Josh went in though lol."

29.     The FBI reviewed the results of search warrants which were served on several cellular telephone providers, which would identify whether, on January 6, 2021, in and around the time of the riot at the Capitol, a cell phone associated with a particular phone number utilized a cell site consistent with providing service to a geographic area that includes the interior of the United States Capitol Building. The FBI did not locate 331-216-8357 in the available information. As described below, this investigation has yielded video and photographic evidence that WINTON was on U.S. Capitol grounds and inside the U.S. Capitol Building with what appears to be a cellular

telephone in his possession. Based on my training and experience, I know that the aforementioned search warrant results were not all-inclusive of all devices present during the riots.

30.     I served TracFone Wireless with a search warrant for cell site information from January 6, 2021, for the phone number 331-216-8357. TracFone Wireless informed me that they do not operate cell towers, and that they use cell towers operated by Verizon Wireless. I am informed by Verizon Wireless that cell site data from January 6, 2021, would have been already deleted at the time I contacted them about serving a search warrant for WINTON's cell phone.

31.     TracFone records list the International Mobile Equipment Identity ("IMEI") number for the cell phone associated with the phone number 331-216-8357 as 352069102681748. IMEI numbers are unique numerical identifiers for cell phones. I have reviewed records that indicate that the IMEI number 352069102681748 is associated with a Samsung Galaxy J3 Orbit phone.

**WINTON'S PARTICIPATION IN THE EVENTS OF JANUARY 6**

32.     On January 6, 2021, WINTON attended the Stop the Steal Rally on the National Mall. At the rally, WINTON appeared in a pair of glasses, a brown, zippered, hooded sweatshirt, blue jeans, tan leather boots, and a camouflage winter hat with ear flaps. At various points in the day, WINTON put on black tactical gloves and an American-flag-patterned gaiter.



***Image 2:*** *a screenshot of open-source video showing WINTON (circled in yellow) attending the Stop the Steal rally, on the National Mall, on January 6, 2021.*

     33.     At approximately 2:27 p.m., WINTON appeared on the Northwest Plaza of the United States Capitol, in front of the Senate Wing Door.



***Image 3:*** *a cropped screenshot of open-source video showing WINTON (circled in yellow), carrying a white sign that says "TRUMP" in red letters, on the Northwest Plaza, outside the U.S. Capitol.*

34.    At approximately 2:40 p.m., rioters began battering the Senate Parliamentarian Door open. WINTON was standing at the bottom of the stairs that led up to the Senate Parliamentarian Door.



***Image 4:*** *a screenshot of open-source video showing WINTON (circled in yellow) standing outside the Senate Parliamentarian Door; at the door, rioters attempt to batter the door open.*



***Images 5, 6, and 7:*** *screenshots of open-source video showing WINTON (circled in yellow) standing outside the Senate Parliamentarian Door, and then rushing up the stairs toward the door after rioters broke it open.*



*Image 8:* screenshot of open-source video showing WINTON (circled in yellow) running up toward the Senate Parliamentarian Door.



*Image 9:* screenshot of open-source video showing WINTON (circled in yellow) running up toward the Senate Parliamentarian Door.

    35.    Once inside the Senate Parliamentarian Door, four uniformed U.S. Capitol Police officers confronted WINTON and the rioters with whom he entered.

14

While three of the officers retreated, WINTON and three other rioters grappled with the fourth officer, who broke free and retreated as well. More rioters entered through the broken door and filled the hallway.



**Image 10:** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) just inside the Senate Parliamentarian door.*



***Image 11:*** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) joining three other rioters in restraining a uniformed U.S. Capitol Police officer.*

36. After the USCP officers retreated, the hallway filled with rioters. WINTON began kicking at the door to S-131, the Senate Appropriations Committee conference room.

16



***Image 12:*** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) kicking at the door of S-131.*

WINTON then watched as another rioter attempted to batter the door to S-131 down

with a wooden sign.

17



***Image 13:*** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) watching as another rioter attempts to batter down the door with a sign.*

37.    The rioter stopped attempting to batter the doors down after the sign he was using broke apart. After the sign broke apart, at approximately 2:44 p.m., a group of rioters began attempting to break the doors down by slamming their shoulders into the doors. WINTON approached this group of rioters and assisted them by throwing his weight behind a rioter, while that rioter slammed their shoulder into the left-hand door. At the same time, three different rioters did the same to the right-hand door. WINTON and the other rioters threw themselves into the doors several times until they eventually broke open the doors. Once the group breached the doors, WINTON entered the adjoining room. As a result of their actions, WINTON and the others caused damage to the doors that cost $21,191 to repair.

18



*Image 14:* *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) joining the group attempting to batter down the door to S-131.*

38.     At approximately 2:48 p.m., WINTON left the Senate Appropriations Suite through the same door he entered it and crossed the Brumidi Corridor to the Senate Parliamentarian's Office. He remained inside for approximately one minute, and then walked east on the Brumidi Corridor. At approximately 2:54 p.m., WINTON returned to the door to Room S-131 and stopped to observe the damage to the door. He then headed back east on the Brumidi Corridor.

19



***Image 15:*** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) observing the damage to the door to S-131.*

39.     At approximately 3:03 p.m., WINTON climbed the stairs outside the Senate Chamber. He attempted to open a locked door to the Senate Chamber but was unable.



*Image 16:* a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) climbing the stairs outside the Senate Chamber.



*Image 17:* a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) attempting to open the door to the Senate Chamber.

40. At approximately 3:04 p.m., WINTON entered the floor of the Senate

Chamber, and remained inside for approximately five minutes, only leaving when a

21

large contingent of Metropolitan Police Department officers entered the chamber and

began ushering rioters out.



*Image 18:* a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) walking into the Senate Chamber.





***Images 19 and 20:*** *screenshots of U.S. Capitol surveillance footage showing WINTON (circled in yellow) walking into the Senate Chamber.*



**Image 21:** *a screenshot of an open-source video showing WINTON (circled in yellow) using his cell phone on the Senate Floor.*



**Image 22:** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) on the Senate Floor.*





*Images 23 and 24: screenshots of U.S. Capitol surveillance footage showing WINTON (circled in yellow) using another rioter's phone to take a photo of that rioter as he sits in then-Senate Majority Leader Mitch McConnell's seat.*





***Images 25 and 26:*** *screenshots of U.S. Capitol surveillance footage showing WINTON (circled in yellow) leaving the Senate Chamber, at approximately 3:09 p.m.*

26

41. After leaving the Senate Chamber, WINTON left the U.S. Capitol through the Senate Carriage Doors at approximately 3:10 p.m. He walked across the East Front of the U.S. Capitol, and then walked west past the House side of the Capitol building.



***Image 27:*** *a screenshot of U.S. Capitol surveillance footage showing WINTON (circled in yellow) leaving the Capitol at approximately 3:10 p.m., through the Senate Carriage Doors.*

**PROBABLE CAUSE REGARDING THE ELECTRONIC DEVICE USED BY WINTON**

42. As shown in the frame from open-source footage below, WINTON carried a cell phone with him on January 6, 2021 and used it in the vicinity of the Capitol, including after he and others illegally entered the Capitol building.

27



***Image 30:*** *a screenshot of an open-source video showing WINTON (circled in yellow) using his cell phone on the Senate Floor.*

43. I also know, based on my training and experience, that cell phones are expensive, and people routinely retain their cell phones for many months or years.

44. I know that hundreds of people have been arrested in connection to the riot that occurred at the U.S. Capitol on January 6, 2021. During searches of many those people's homes, from early 2021 through present, in multiple jurisdictions, law enforcement has recovered clothing, paraphernalia, tools, and devices that were worn, used, or carried on January 6, 2021.

45. For example, on March 5, 2024, agents in the Southern District of Ohio searched a residence pursuant to a search warrant and recovered a cell phone containing photos taken on January 6. On April 25, 2024, agents in the Eastern District of Louisiana searched a residence pursuant to a search warrant and recovered a flag and flagpole stolen from the Capitol on January 6, the cell phone a suspect

carried inside the Capitol on January 6, and a hat worn on January 6. On May 15, 2024, agents in the Northern District of New York searched a residence pursuant to a search warrant and recovered a stocking cap and jacket worn on January 6, as well as a phone that contained text messages discussing the suspect's conduct and a photo taken in Washington, DC on January 6. On October 8, 2024, agents in the Central District of California seized and searched a cell phone belonging to a suspected rioter that contained numerous photos and videos of the January 6 Riot. On October 29, 2024, agents in the Southern District of Illinois searched a suspected rioter's residence pursuant to a search warrant and found a distinctive jacket worn by the suspected rioter on January 6, along with credit card statements indicating purchases in Washington, DC on January 5 and 6.

46.     As described above, there is evidence that WINTON had in his possession a digital device, a cell phone, while at the U.S. Capitol on January 6, 2021. In addition, based on photos and videos of the offenses that date, numerous persons committing the **Subject Offenses** possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.

47.     Further, based on the investigation, numerous persons committing the **Subject Offenses** possessed digital devices to communicate with other individuals to plan their attendance in Washington D.C. on January 6, 2021, to coordinate with other participants at the gatherings there that day, and to communicate and post on social media and digital forums about the events of January 6 after they occurred. A search of

WINTON's acquaintance's cell phone revealed text messages that WINTON sent discussing the events of January 6.

48.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. The Pew Research Center for Internet & Technology estimated that 97% of Americans owned at least one cellular phone and that 85% of Americans use at least one smartphone as of February 2021. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited December 17, 2024).

49.     Based upon my training and experience, I know that cellular phones may contain relevant evidence of the **Subject Offenses**, including text messages made or received from the **Subject Phone** that are located in the memory of the **Subject Phone**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the **Subject Offenses**. Moreover, digital photographs located in the memory of the **Subject Phone** may contain images of the tools or participants involved in the **Subject Offenses**. Moreover, digital photographs stored in the **Subject Phone** may contain images of the user of the **Subject Phone**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

50.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why,

when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

51. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by

31

breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

52.     Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses commonly use cellular telephones as a means to communicate. As aforementioned, a search of the cellular phone of WINTON's acquaintance showed that they communicated via text message on January 6, 2021, including possible discussion of means to destroy property and enter restricted areas, stating, "We need some prybars." Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phone** is associated with the target(s) in this case, because there was telephonic communication between participants involved in the **Subject Offenses**, and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators, there is probable cause to believe the **Subject Phone**, described further in Attachment A, contain evidence of violations of the **Subject Offenses**.

## II.      SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

54.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed,

33

password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

55.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

56.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## III.     CONCLUSION

57.     Based on the above information, I respectfully submit that there is probable cause to believe that the **Subject Offenses**, in violation of Title 18, United States Code, Sections 1361, 1752(a)(1), (a)(2), and (a)(4), and Title 40, United States Code, Sections 5104(e)(2)(A), (e)(2)(C)(i), (e)(2)(D), (e)(2)(F), and (e)(2)(G), have been committed, and that evidence, instrumentalities, fruits, and contraband relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phone**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Phone** more particularly described in

Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

M. Sean McQuiston
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone 20th day of December, 2024

Honorable BETH W. JANTZ
United States Magistrate Judge

35

## ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

The property to be searched is a Samsung Model #SM-S367VL (Galaxy J3 Orbit) smart phone bearing the phone number 331-216-8357 and IMEI number 352069102681748 (the "**Subject Phone**").

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

1.      Evidence, instrumentalities, fruits and contraband concerning violation of 18 U.S.C. § 1361 (injuring or depredating property of the United States); 18 U.S.C. § 1752(a)(1) (entering or remaining in restricted buildings or grounds), (a)(2) (disorderly and disruptive conduct in a restricted building or grounds), and (a)(4) (engaging in any act of physical violence in a restricted building or grounds); 40 U.S.C. § 5104(e)(2)(A) (entering or remaining on the floor of either House of Congress), (e)(2)(C)(i) (entering or remaining in a room in any of the Capitol Buildings set aside or designated for the use of either House of Congress, with intent to disrupt the orderly conduct of official business), (e)(2)(D) (disorderly or disruptive conduct in the Capitol Buildings), (e)(2)(F) (engaging in an act of physical violence in the Grounds or any of the Capitol Buildings), and (e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) (the "**Subject Offenses**") that have been committed by JOSHUA WINTON ("WINTON") and other identified and unidentified persons, as described in the search warrant affidavit, that constitute evidence of the **Subject Offenses**, as follows:

a.      Evidence of any conspiracy, planning, or preparation to commit **Subject Offenses**;

b.      Evidence concerning efforts after the fact to conceal evidence of **Subject Offenses**, or to flee prosecution for the same;

c.      Evidence concerning materials, devices, or tools that were used to unlawfully commit the **Subject Offenses**;

      d.      Evidence of communication devices used in relation to the **Subject Offenses**;

      e.      Evidence of the state of mind of WINTON and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

      f.      Evidence concerning the identity of persons who either

      i.      collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or

      ii.      communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

      g.      Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

      h.      Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

      i.      Evidence concerning the official proceeding that was to take place at Congress on January 6, 2021, *i.e.*, the certification process of the 2020 Presidential Election;

j.     Evidence concerning efforts to obstruct, impede, or disrupt the official proceeding that was to take place at Congress on January 6, 2021, *i.e.*, the certification process of the 2020 Presidential Election;

k.     Evidence concerning the breach and unlawful entry of the United States Capitol on January 6, 2021;

l.     Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

m.     Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

n.     Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

o.     Evidence concerning awareness that the U.S. Capitol was closed to the public on January 6, 2021;

p.     Evidence of the defendant's presence at the U.S. Capitol on or around January 6, 2021;

q.     Evidence concerning the results of, challenges to, or questions about the legitimacy of the 2020 Presidential Election;

r.     Evidence regarding travel to Washington, D.C. in or around January 2021, motive and intent for travel to Washington, D.C. in or around January 2021, the planning of travel to and activity in Washington, D.C. on or

3

about January 6, 2021, research about the U.S. Capitol, and mode of travel, travel expenses, and travel logistics on or about January 6, 2021.

      s.     Evidence regarding the riot at the U.S. Capitol on January 6, 2021.

      2.     Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

      a.     Any records and/or evidence revealing WINTON'S presence at the January 6, 2021 riot;

      b.     Any records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from November, 2020 through January, 2021;

      c.     WINTON's (and others') motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

      d.     WINTON's (and others') activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021.

      3.     Photographs, in particular, photographs of WINTON, co-conspirators, or events in Washington D.C. on January 6, 2021, which constitute evidence of the **Subject Offenses**.

      4.     Evidence of relationships between members of a conspiracy, including evidence of identification and evidence of motivation to engage in the **Subject Offenses**.

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.